**In the Matter of James Yao GLEASMAN and Margaret Yao Gleasman, Debtors.**

**James Yao GLEASMAN and Margaret Yao Gleasman, Appellants,**

v.

**JONES, DAY, REAVIS & POGUE, Appellee.**

**No. 90–8301.**

United States Court of Appeals, Fifth Circuit.

June 10, 1991.

James M. Vogt, Stephen A. Roberts, Edward D. Burbach, Griggs & Harrison, Austin, Tex., for appellants.

Morris Atlas, Gary Gurwitz, Lisa Powell, Atlas & Hall, McAllen, Tex., for appellee.

Before GOLDBERG, HIGGINBOTHAM, and JONES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This suit for legal malpractice rests on diversity jurisdiction and is controlled by Texas law. The grant of summary judgment for the law firm rested on Texas's two-year period of limitations and discovery rule.

James and Margaret Yao Gleasman sued the law firm of Jones, Day, Reavis & Pogue in a Texas state court. After the case was removed to the federal bankruptcy court, where the Gleasmans had earlier filed for bankruptcy, the bankruptcy court granted summary judgment in favor of Jones, Day on the ground that the two-year limitations period had run on the Gleasmans' malpractice claim. The court reasoned that the suit was time-barred under Texas law because the Gleasmans knew, or should have discovered through the exercise of reasonable care and diligence, the facts establishing the elements of their claim more than two years before they filed suit. The district court affirmed. We affirm on essentially the same grounds.

## I.

In February 1983 James and Margaret Yao Gleasman purchased 151 acres of unimproved land in Travis County, Texas. In October 1984 the Gleasmans refinanced the land by borrowing $2.5 million from Equitable Savings Association. The accompanying note had a maturity of one year. Under its terms, the Gleasmans were to pay Equitable Savings a one-year interest payment based on a variable rate of not less than 14 percent. The Gleasmans also gave Equitable Savings a deed of trust in the land, a $125,000 origination fee, and an assignment of net profits under which the Gleasmans promised to pay Equitable Savings at least an additional $322,200.00 at the maturity of the note. The note also contained certain covenants restricting the Gleasmans' use of the land to residential purposes. In this transaction the Gleasmans were represented by the law firm of McDuff & Damron. Before closing the loan with Equitable Savings, the Gleasmans reviewed the truth-in-lending statement with their attorneys. That statement estimated the annual interest rate on the loan to be 32.8 percent over the one-year term of the loan. When the Gleasmans asked their attorneys whether this was usurious, the attorneys responded by saying that they would agree to sign an opinion that the rate was not usurious, as a favor to the Gleasmans; however, they implied that by doing so they were taking a risk, because of the possibility that the loan might later be found to be usurious. The Gleasmans then closed the loan.

In December 1984, the Gleasmans hired Jones, Day to represent them in forming an Arabian-horse limited partnership.[1] Simul-

---

1. The Gleasmans state that the purpose of the syndication was to raise money to pay off the Equitable Savings note.

taneously, Jones, Day was representing Equitable Savings in other matters, including a merger between Equitable Savings and Northwest Savings Association. The Gleasmans contend that they were unaware that Equitable Savings was a Jones, Day client and hence that a potential conflict of interest existed. Jones, Day says that while it never explicitly told the Gleasmans that it represented Equitable Savings, the Gleasmans either knew or should have known that Equitable Savings was also a client. On the other hand, the Gleasmans did not inform Jones, Day of the lien Equitable Savings held against their land until January 1985. At that time the Gleasmans provided Jones, Day with copies of the documents of the Equitable Savings loan—including those containing the net-profits provision, the deed restrictions, and the "no usury" opinion.

What happened next is disputed: Jones, Day says that, upon seeing the terms of the Equitable Savings loan, it advised the Gleasmans that, as long as that loan remained outstanding, the net-profits provision and deed restriction would have to be disclosed to potential investors in the limited partnership. The Gleasmans, on the other hand, argue that Jim Erb—a Jones, Day lawyer—told them that SEC regulations would prevent the syndication from going through with the net-profits provisions; that before proceeding with the syndication, the Gleasmans would have to retire the Equitable Savings loan. The Gleasmans contend that this statement was false and misleading and was calculated to get the Gleasmans to retire the usurious Equitable–Savings loan and facilitate regulatory approval of a merger between Equitable Savings and another savings institution. Jones, Day denies making any false or misleading statements, but readily acknowledges that when it saw the net-profits interest held by Equitable Savings it had some question about usury. Yet, Jones, Day explains, because it owed a duty of loyalty to Equitable Savings as well as to the Gleasmans, Jones, Day left the raising of the issue to the Gleasmans' other law firms, with the further plan that if the Gleasmans decided to refinance the Equitable Savings loan, it would insist that the Gleasmans hire another lawyer for the transaction.

At some point the Gleasmans asked Mr. Erb to arrange a meeting between themselves and a representative of Equitable Savings, so that the Gleasmans could inquire about refinancing their note. Mr. Erb set up the meeting, which was attended by the Gleasmans and Danny Payne, a representative of Equitable Savings. Before the meeting began, however, Erb excused himself from the room, saying he could not remain in attendance because of the possibility of a conflict of interest. This is how Margaret Gleasman characterized the meeting:

> Erb then arranged a meeting for us with Danny Payne in a conference room at the Jones, Day office. When we arrived at the office, Erb took us to the conference room, introduced us to Payne and then excused himself from the room with words to the effect of, "We'd rather you meet alone because there might be some kind of conflict." Because he elaborated no further on the matter, my husband speculated Franklin might be buying Equitable.

The Gleasmans decided to refinance their loan through Franklin Savings Association. Franklin Savings is also a client of Jones, Day, a fact disclosed to the Gleasmans. Jones, Day argues that Franklin Savings was the only bank that was able and willing to refinance the Equitable loan. The loan was for $3,625,000. Its terms included a 15 percent annual interest rate, a $145,000 origination fee, and a deed of trust on the land. Under the loan agreement, the Gleasmans were to execute and deliver to Equitable Savings a document entitled "Full Release," under which the Gleasmans agreed to release and discharge Equitable Savings from liability for usury relating to the Equitable Savings note. The Gleasmans contend that they signed the Franklin Savings note under duress and as a result of the fraud and conspiracy committed by Jones, Day in conjunction with Equitable Savings and Franklin Savings and that, therefore, the usury release

is invalid. The Franklin Savings loan was closed on June 28, 1985. The law firm of Coffee, Goldston & Vogt, and later the firm of Vogt & Scherer, represented the Gleasmans in connection with the Franklin Savings loan. Jones, Day continued to represent the Gleasmans with regard to the syndication until the end of 1985, when, for reasons unrelated to this case, the Gleasmans stopped pursuing the horse syndication. Jones, Day never represented the Gleasmans on any other matters. The note was renewed on September 30, 1986.

The Gleasmans eventually defaulted on the Franklin Savings note. Subsequently, in January 1988, they filed suit in Texas state court against several financial institutions in connection with the Equitable Savings loan and the Franklin Savings loan. The state suit alleged usury, fraud, duress, conspiracy, and bad faith. On March 23, 1988, the Gleasmans amended their complaint to include Jones, Day as a defendant. In September 1988 the Federal Home Loan Bank Board declared insolvent CreditBanc Savings, the successor of Equitable Savings, and Franklin Savings, and adopted a resolution appointing the Federal Savings and Loan Insurance Corporation as receiver of both institutions.

In October 1988 James Gleasman declared bankruptcy, and in January 1989 Margaret Gleasman followed suit. Both bankruptcies were filed in the U.S. Bankruptcy Court in the Western District of Texas. FSLIC intervened and removed the state lawsuits to the bankruptcy court, where the matters were consolidated. In January 1989 Franklin Federal Bancorp was granted intervenor status in place of the FSLIC. In August 1989 the bankruptcy court granted summary judgment in favor of Jones, Day and Franklin Federal Bancorp. On review, the district court affirmed the bankruptcy court's decision.

The Gleasmans appeal the portion of the district court's judgment affirming the bankruptcy court's grant of summary judgment in favor of Jones, Day. The Gleasmans alleged that Jones, Day did not tell them of their potential usury claim against Equitable Savings or tell them that Jones, Day had a potential conflict of interest due to its representation of Equitable Savings. They also alleged that Jones, Day had deliberately concealed these facts from them as part of a conspiracy with Equitable Savings and Franklin Savings. This, said the Gleasmans, was a breach of a fiduciary duty, negligence and fraud. In analyzing the plea of limitations, both the bankruptcy court and the district court treated these variations as a single allegation of legal malpractice.

Both the bankruptcy court and the district court found that the defense of limitations presented no genuine issue of material fact because the applicable two-year statute of limitations had expired under Texas law. Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986). Both courts ruled that limitations had run under the standards announced in *Willis v. Maverick*, 760 S.W.2d 642 (Tex.1988). In *Willis*, the Texas Supreme Court held that "the statute of limitations for legal malpractice actions does not begin to run until the claimant discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of his cause of action" *Id.* at 646. Both the bankruptcy court and the district court were convinced that the Gleasmans' knew of, or should have discovered, their potential usury claim and hence their potential malpractice claim at least by June of 1985—more than two years before the date on which the Gleasmans filed the state suit against Jones, Day in March of 1988.[2] The principal issue in this appeal is whether that summary-judgment conclusion was correct.[3]

**2.** The Gleasmans contend that the bankruptcy court's summary-judgment decision should have been reversed because the bankruptcy judge was generally confused about the nature of the claim and summary-judgment motion. The Gleasmans read certain language in the court's order to suggest that the court mistakenly thought the claim was for usury rather than for malpractice. We are more charitable in our reading—not surprisingly—and we are also persuaded that the bankruptcy judge correctly understood the case as one for legal malpractice.

**3.** The Gleasmans claim that it was reversible error for the district court, in reviewing the

## II.

Summary judgment is appropriate if, after discovery, there is no genuine dispute over any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also* Fed.R.Civ.P. 56. Material facts are those that will affect the outcome of the lawsuit. *Anderson,* 106 S.Ct. at 2510. A genuine dispute requires more than metaphysical doubt; there must be an issue for trial. *Matsushita,* 106 S.Ct. at 1355–56. Once the party moving for summary judgment shows the absence of a material factual dispute, the burden shifts to the non-moving party to designate specific facts establishing an issue for trial. *Celotex,* 106 S.Ct. at 2552–53.

The main issue here is whether resolution of a material question of fact is necessary in answering the question of whether the Gleasmans before March 1986 knew or should have discovered upon reasonable investigation that they had a potential malpractice claim against Jones, Day.

The Gleasmans argue that—for their claim against Jones, Day to be time-barred under *Willis*—it must be shown that, at least two years before they filed suit against Jones, Day, the Gleasmans knew or should have discovered by reasonable investigation that (i) the Equitable Savings loan was potentially usurious ˙ *and* (ii) Jones, Day had a potential conflict of interest while it was representing the Gleasmans. The Gleasmans contend that Jones, Day failed to make either showing. The bankruptcy court, however, held that only the first showing was required, because "notice of a usury claim is notice of a claim for malpractice for allegedly deceiving the

client as to whether a usury claim existed." The bankruptcy court also found that it was "unquestionable" that the Gleasmans knew or should have discovered the potential usury claim with regard to the Equitable Savings loan before the relevant date. The district court implicitly adopted the bankruptcy court's reasoning and conclusion. After quoting the bankruptcy judge's findings, the district court held that "the admissions by the [the Gleasmans] on the record support Judge Clark's finding [that the Gleasmans] knew or should have known about the alleged usury and malpractice more than two years before they filed their lawsuits and such admissions favor summary disposal of the claims." We are persuaded that the grant of summary judgment was proper.

## III.

When "accrual" occurs is a matter of substantive law. Historically, courts have held that accrual occurs at the time of the injury or of the negligence. *Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1364 (5th Cir.1984) (applying Texas law); *Carrell v. Denton,* 138 Tex. 145, 157 S.W.2d 878 (1942) (accrual begins at time of negligence). The discovery rule, on the other hand, provides that the limitations period begins to run when the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the injury. The Texas Supreme Court adopted the discovery rule in certain contexts in *Gaddis v. Smith,* 417 S.W.2d 577, 580–81 (Tex.1967). There the court held that in medical malpractice cases in which a physician, during surgery, leaves a foreign object inside a patient's body, the statute of limitations begins to run only when the patient discovers or reasonably could have discovered the presence of the object. Since that case,

bankruptcy court's summary-judgment decision, to cite Fed.R.Civ.P. 52(a), which contains the clearly erroneous standard. They argue that only Fed.R.Civ.P. 56 should be applied in summary judgment cases. It is apparent, however, that, irrespective of the propriety of *citing* the clearly-erroneous standard in a summary-judgment case, the district court in the body of its opinion *applied* the well-established and correct-

ly stated Rule 56 standard: "Appellants complain the Appellees did not establish, by their summary judgment proof, there exists no genuine issue of material fact on Appellants' claims. This court disagrees. Appellees successfully established in their Motion and subsequent pleadings that the fact issues, as stated by the Appellants, were properly subject to summary judgment."

Texas courts have extended the discovery rule to other types of medical malpractice, *e.g.*, *Hays v. Hall*, 488 S.W.2d 412 (Tex. 1972) (applying discovery rule to negligent vasectomy operation); however, the rule has not been applied in every medical malpractice situation, *Robinson v. Weaver*, 550 S.W.2d 18 (Tex.1977) (declining to apply discovery rule to medical misdiagnosis). The discovery rule has also been extended to other types of cases where the plaintiff has difficulty discovering the negligent act. *E.g.*, *Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex.1976) (discovery rule applicable to false credit report).

The Texas Supreme Court extended the discovery rule to legal malpractice actions in *Willis v. Maverick*, 760 S.W.2d 642 (Tex. 1988). In making this extension, the court relied on two related policy considerations. First, a layperson may have great difficulty recognizing an injury from legal malpractice when it happens. *Id.* at 645 (citing Ward, *Legal Malpractice in Texas*, 19 S.Tex.L.J. 587, 613 (1978)). Second, the fiduciary relationship between lawyer and client with its implicit and essential trust increases the chance that the malpractice will not be immediately found out. *Id.* (citing *Robinson*, 550 S.W.2d at 23 (Pope, J., dissenting)). Moreover, the Texas court has observed, declining to apply the discovery rule to legal malpractice would significantly encourage attorneys to breach another obligation—the duty of full disclosure—since, by not disclosing, attorneys could avoid liability. *Id.* (citing *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 98 Cal.Rptr. 837, 845, 491 P.2d 421, 429 (1971)).

## A.

Jones, Day argues that the Gleasmans' legal-malpractice action is time-barred because the Gleasmans knew of their potential usury claim at least by June of 1985—which is over two years before they named Jones, Day as a defendant in March of 1988. The summary-judgment record provides overwhelming support of the Gleasmans' knowledge of the usury claim. In October 1984, before closing the Equitable Savings loan, Mr. Gleasman asked his attorneys about the possibility of usury and McDuff and Damron indicated reluctance in signing the no-usury opinion. Later, when the Gleasmans began to consider refinancing the Equitable Savings note—some time around May of 1985—the lawyers representing them in that matter, none of whom were Jones, Day lawyers, raised the possibility of usury. According to Mr. Gleasman's testimony, "Nancy [Scherer] had looked at the loan documents and had commented it was an awfully high interest rate and took the liberty to turn it over to Mr. Goldston to look at because of the high interest rate on the loan papers." Then, after examining the terms, Goldston told the Gleasmans "that he had looked at the documents on a rather cursory first blush reading of them, and that he thought the interest rate was awful high and perhaps it was usurious." The firm offered to do an in-depth study of the usury issue, but Mr. Gleasman declined the offer. Then, perhaps most telling, in June of 1985 at the closing of the Franklin Savings loan, the Gleasmans, after consultation with Ms. Scherer, executed a release of all usury claims against Equitable Savings. It is indisputable that, at least by this time, the Gleasmans were on notice of their potential usury claim against Equitable Savings.

The Gleasmans maintain that, because they received conflicting advice from their various lawyers regarding the possibility of a usury claim, they were not on notice of their potential usury claim. Some lawyers said the Equitable Savings loan might be usurious; while others said that it was not. We are nonetheless persuaded that the Gleasmans knew or should have discovered, at least by the time they signed the usury release, that they had a potential usury claim.

The Gleasmans next argue that notice of the usury claim was not enough to trigger the running of the statutory period. They insist that because their lawsuit sounds in fraud, deceit, and conflict of interest, the statutory period should begin to run only when they knew or should have discovered not only that they had a usury claim but also that Jones, Day had a conflict of inter-

est. The upshot of their argument appears to be that, for the suit to be time-barred, Jones, Day must demonstrate that the Gleasmans knew or should have discovered within the relevant time period not only that they had a usury claim but also that Equitable Savings was a client of Jones, Day.

There is a powerful argument that notice of the usury claim alone was sufficient to start the running of the statutory period, although we do not rest our decision on this argument. In *Timberlake v. A.H. Robins Co.*, 727 F.2d 1363 (5th Cir.1984), a medical malpractice suit, we interpreted the Texas discovery rule to mean that the statutory period commences when the plaintiff discovers his injury or its cause. *Id.* at 1365–66. We concluded that the rule, as developed by the Texas courts, does not require that "the statutory period be tolled until the plaintiff learns that the defendant's conduct may have been wrongful." *Id.* at 1365.

In *Timberlake* the plaintiff suffered acute pelvic inflammation in April of 1978, which required her to undergo a hysterectomy. At that time her doctor told her that her illness had been caused by her Dalkon Shield intrauterine device. In April of 1981 she saw a television program concerning the Dalkon Shield, and she then learned that the manufacturer, A.H. Robins Company, may have been negligent in the manufacture and sale of its product. She filed suit in August 1981—only four months after she learned that the manufacturer might be at fault, but over two years after she learned that her IUD caused her injury. *Id.* at 1364. We held that, because the plaintiff knew of her injury and its cause in March of 1978, the statutory period began running at that time—rather than when she later learned of the manufacturer's potential fault—and therefore her cause of action was time-barred. *Id.* at 1366. *See also Berkley v. American Cyanamid Co.*,

799 F.2d 995, 999 (5th Cir.1986) (applying *Timberlake* to reach same result).

As the bankruptcy court and the district court saw this case, the Gleasmans' asserted injury stems entirely from the failure to pursue their usury claim against Equitable Savings.[4] In sum, the argument is that when the Gleasmans were on notice of their usury claim, they were on notice of their injury and its cause. It follows, the argument continues, that since they should have discovered their potential usury claim by at least June of 1985, their cause of action is time-barred.

### B.

We will accept arguendo the Gleasmans' contention that under the discovery rule, for the Gleasmans' malpractice action to be time-barred, Jones, Day must show that the Gleasmans knew or should have discovered not only the potential usury claim but also Jones, Day's potential conflict of interest. We can do so because even under this standard, the Gleasmans' action is time-barred. There is little question but that the Gleasmans not only knew or should have known that Jones, Day represented Equitable Savings but also knew or should have known that Jones, Day had a potential conflict.

Although Jones, Day admits never explicitly saying to the Gleasmans that it represented Equitable Savings, Jones, Day argues that, while the firm was representing them, the Gleasmans knew or should have known that Equitable Savings was also a client of the firm. It is difficult to see it any other way. It was, after all, the Gleasmans who asked Jones, Day to set up the meeting with Equitable Savings to discuss the refinancing. Jones, Day also contends that the Gleasmans should have discovered the potential conflict, when several of the Gleasmans' other lawyers raised the possibility of usury, and the Jones, Day lawyers remained silent. Perhaps, but

---

**4.** Indeed in their complaint the Gleasmans requested damages in an amount equal to the total in interest and principal that they were obligated to pay under both the Equitable Savings note and the Franklin Savings note. Their argument was that, had Jones, Day informed that the Equitable Savings loan was usurious and thus unenforceable, they would not have needed the Franklin Savings loan.

there is more compelling evidence of the Gleasmans' knowledge. Around February 19, 1985, Jim Erb, the Jones, Day lawyer, told the Gleasmans the firm might have a conflict. At the meeting between the Gleasmans and the representative of Equitable Savings, Mr. Erb excused himself from the room and said "we'd rather you met alone because there might be some kind of conflict." The only other people in the room when the comment was made were the Gleasmans and the representative from Equitable Savings. We are persuaded that the Gleasmans were then put on notice that a conflict might exist and that, if they were not sure, they should have investigated the matter further.[5]

That is, the Gleasmans knew or should have known—at least by February 1985—that Jones, Day might have a conflict of interest and—at least by June 1985—that the Equitable Savings loan was usurious. As the Gleasmans were saddled with this knowledge more than two years before they sued, their legal-malpractice action is time-barred.

### IV.

### A.

The Gleasmans also contend that Jones, Day fraudulently concealed from them both the usurious nature of the Equitable Savings loan and the fact that Equitable Savings was a client of Jones, Day. In this case, this assertion adds little, if anything. The Texas Supreme Court stated the doctrine of fraudulent concealment as follows:

> When the defendant is under a duty to make a disclosure but fraudulently conceals the existence of a cause of action from the one to whom it belongs, the guilty party will be estopped from relying on the defense of limitations until the right of action is, or in the exercise of reasonable diligence should be, discovered.

*Nichols v. Smith,* 507 S.W.2d 518, 519 (Tex.1974) (citations omitted), *quoted in Timberlake,* 727 F.2d at 1366. Under this doctrine the plaintiff has a duty to use reasonable diligence to discover his cause of action. *Id.* Moreover, "[t]here cannot be fraudulent concealment of facts which admittedly were or should have been known [by the plaintiff.]" *Fusco v. Johns–Manville Products Corp.,* 643 F.2d 1181, 1184 (5th Cir.1981). In *Timberlake* we applied this principle and found that the plaintiff had failed to exercise reasonable diligence to discover her cause of action after she had discovered the nature of her injury. Therefore, we rejected her asserted defense that A.H. Robins was guilty of fraudulent concealment. 727 F.2d at 1366–67. The Gleasmans had enough facts by June 1985 that with reasonable diligence they should have discovered any claim they might have had.

### B.

As we have mentioned, at times the Gleasmans seem to argue that the gravamen of their complaint is not legal malpractice but fraud. For instance, they argue that Jones, Day misled them to believe that SEC regulations required that they pay off the Equitable Savings loan before pursuing the Arabian-horse syndication. Despite these drifts and despite varying labels in their amended complaint, the Gleasmans never dispute the characterization of the suit as one for legal malpractice. More to the point, they do not contest the applicability of the two-year statute of limitations that applies to legal malpractice claims. Nor do they point to another applicable limitations period or contest the general applicability of *Willis* to this case. Rather, they explicitly invoke *Willis*'s extension of the discovery rule to legal-malpractice cases, even though *Willis* was a negligence case rather than a fraud case. The parties and the courts below assumed that only the two-year statute with its discovery trigger is applicable. For that reason, we do not

---

**5.** According to Ms. Gleasman, following Erb's statement and departure, Mr. Gleasman "speculated Franklin might be buying Equitable." But even on this interpretation of the statement, Mr. Gleasman appears to understand that Jones, Day was representing Equitable Savings as well as Franklin Savings.

decide the point, but proceed with a similar assumption. Indeed, the *Willis* court's adoption of the discovery rule, relied upon by the Gleasmans, reflected the reality that a claim against a lawyer by a client is not neatly cabined—given the fiduciary duty owed by the lawyer.

We do not reach other issues raised but not essential to our decision. The district court's judgment affirming the bankruptcy court's grant of summary judgment is AFFIRMED.