United States Court of Appeals,

Fifth Circuit.

No. 93-1202.

INDUSTRIAL INDEMNITY COMPANY, Plaintiff-Appellant,

v.

CHAPMAN AND CUTLER, et al., Defendants-Appellees.

June 16, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before WISDOM and HIGGINBOTHAM, Circuit Judges, KAUFMAN[*], District Judge.

FRANK A. KAUFMAN, District Judge:

Plaintiff-Appellant Industrial Indemnity Company ("IIC") appeals from the grant of summary judgment by the federal district court below in favor of defendants-appellees.[1] In that court, appellant alleged instances of actionable negligence, amounting to legal malpractice, on the part of appellees. Appellees successfully sought the grant of summary judgment upon the ground that appellant's claims were barred by the applicable statute of limitations. For the reasons set forth *infra,* we affirm.

I.

The district court, in its Memorandum Order granting summary judgment for appellees, set forth the following facts:

---

[*]District Judge of the District of Maryland, sitting by designation.

[1]The defendants-appellees in the within action are the law firm of Chapman & Cutler, headquartered in Chicago, Illinois, and fifty of its general partners (hereinafter referred to collectively as "Chapman").

1

In September 1984, [IIC] issued a commitment to guarantee a real estate transaction in Dallas, Texas. Under the commitment, IIC undertook to insure payment of promissory notes that several Texas limited partnerships, related to Cloyce K. Box ("Box"), planned to issue to institutional investors. The collateral for the transaction was 494 acres of land in Frisco, Texas. Box intended to use the funds obtained from this financing to invest in a cement plant.

IIC's guaranty provided that if the makers of the promissory notes, which totaled $120 million, did not pay them in full at their maturity date, October 15, 1988, IIC would pay them. The IIC employees responsible for analyzing the transaction and its attendant risk to IIC failed, however, to perform their usual underwriting investigation before the commitment was issued.

IIC claims in this suit that by December 1984, when the policies were to be issued, it realized that the commitment had been obtained by the fraud of its agent FGC Services, Inc., and other participants in the transaction, primarily with respect to the value of the collateral.[1] Representatives of IIC who travelled to Dallas, Texas[,] in December for the scheduled closing of the transaction intended, so it is alleged, to withdraw from the venture. Instead, they attempted to renegotiate IIC's commitment. Several changes were made, but when IIC pushed for additional concessions, Box threatened a $150 million lawsuit if it failed to honor its commitment.

[1] IIC has not claimed that Chapman was guilty of any misrepresentations or omissions.

At this point, IIC consulted a Chapman partner, Paul Kosin ("Kosin"), who was in Dallas to assist with the transaction. According to IIC, Kosin advised that Box appeared to have a meritorious claim and would probably prevail in a lawsuit. IIC maintains that the advice given by Kosin was incorrect and given without proper analysis or review. Further, IIC alleges that but for Kosin's advice, it would not have issued the subject policies guaranteeing payment of the notes.

IIC reviewed this transaction, as well as the others it had made, throughout 1985 and 1986, thereby incurring costs for attorneys' fees and other investigative expenses. In 1985, IIC terminated its financial guarantee business, recognizing in consequence a loss of $160 million. Crum and Forster ("C & F"), the parent company of IIC, set up a discontinued operations reserve on its books to cover potential future administrative costs and claims expenses which might arise under the different guarantees IIC had

2

issued. This reserve included a contingency reserve of $55 million for the Frisco transaction which was recorded as a $55 million loss on the financial statements of IIC's parent company, C & F, and its parent, Xerox Financial Services (a subsidiary of Xerox Corporation).

Shortly after issuing the policies, in January 1985, IIC received a premium of approximately $4.6 million from the limited partnerships. The promissory notes issued by IIC were "zero coupon notes" which required no interim installments of principal or interest and no financial performance or payment by the makers of the notes to the holders until October 1988. Upon the notes' maturation, the makers completely defaulted, leaving IIC to perform as required and to pay the holders the full $120 million. After so doing, IIC foreclosed upon the inadequate real-estate collateral.

IIC, a California corporation, instituted suit in the Superior Court for San Francisco County, California, on April 6, 1989, alleging legal malpractice by appellees. Appellees promptly removed the case to the federal district court for the Northern District of California based upon the diversity of citizenship among the parties. 28 U.S.C. § 1332. The headquarters office of the law firm of Chapman & Cutler is located in Illinois, and none of the partners of that firm who also is named as a defendant resides in California. After the said removal, appellees successfully sought transfer of the case from the Northern District of California to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a)[2] and moved for summary judgment upon the ground

_____

[2]§ 1404(a) states:

     For the convenience of parties and witnesses, in

3

that IIC's action was barred by the applicable statute of limitations.

The "transferee" federal district court in Texas, applying California choice-of-law case law in the same manner as would the "transferor" federal district court in California to which this case earlier had been removed,[3] determined that either the California or Texas statute of limitations applied and that, under either statute, the period for filing suit upon IIC's claim had expired. IIC appeals that conclusion to this Court, asserting that the district court erred in its invocation of the California and Texas statutes, rather than the statute of limitations of Illinois, and that, even under each or both of the California and Texas statutes, the limitations period had not expired.[4]

---

the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[3]*See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

[4]In support of its appeal to this Court in connection with the limitations issue, IIC has referred in its briefs to several factual and legal contentions which appellees assert, in a motion to strike filed with this Court, were not presented in any court below. Because we determine that the district court correctly decided the question of limitations, whether or not any or all of IIC's said contentions are sound, we treat appellees' motion to strike as moot.

IIC also urges this Court to rule that the district court mistakenly treated two of appellees' requests for admission as admitted by IIC, despite IIC's claim that it previously had denied the assertions which were the subjects of those requests. However, IIC readily admits that, if this Court affirms the grant of summary judgment in this case, we need not decide that question. Accordingly, because we do so affirm, we do not reach that issue.

For the reasons set forth *infra,* and on a *de novo* review basis,[5] we conclude that the district court below correctly employed California choice-of-law principles in determining that either the California or Texas statute of limitations applies in this case and in granting summary judgment for appellees upon the basis that, under either statute, the limitations period within which appellant could file suit ended before appellant so filed.

## II.

The parties agree that the district court correctly determined that, in this case, California's choice-of-law rules govern which statute of limitations should apply. *See Cowan v. Ford Motor Co.,* 713 F.2d 100, 104 n. 6 (5th Cir.1983) (stating that when a case is "transferred to another federal district court ... under § 1404(a), the transferee court must act as would the transferor court"); *see also KL Group v. Case, Kay & Lynch,* 829 F.2d 909, 915 (9th Cir.1987). We also so agree.

The parties also agree that the district court appropriately recited the test for selecting the applicable statute of limitations under California law. California utilizes the " "governmental interest' approach to questions of conflicts of laws." *In re Aircrash in Bali,* 684 F.2d 1301, 1307 (9th Cir.1982) (citation omitted); *Offshore Rental Co. v. Continental Oil Co.,* 22

---

[5]"The grant of a motion for summary judgment is reviewed *de novo.*" *Securities & Exchange Comm'n v. Recile,* 10 F.3d 1093, 1097 (5th Cir.1993). The appellate court applies "the same standard as a district court would employ under Federal Rule of Civil Procedure 56(c)." *Abbeville Gen. Hosp. v. Ramsey,* 3 F.3d 797, 801 (5th Cir.1993); *Recile,* 10 F.3d at 1097.

Cal.3d 157, 148 Cal.Rptr. 867, 869, 583 P.2d 721, 723 (1978). That

approach requires the Court to engage in three discrete steps:

> 1. To examine the substantive law relating to [the topic in question] in [the various jurisdictions at issue], to determine if the laws in th[ose] jurisdictions differ as applied to this ... transaction;

> 2. If they do differ, then to determine whether [those] jurisdictions have an interest in having their laws applied. If only one jurisdiction has such an interest, then we do not have a "true conflict" and we apply the law of that jurisdiction;

> 3. If there is a "true conflict" then we proceed, under the "comparative impairment" approach, to determine which jurisdiction's interest would be more impaired if its policy were subordinated to the policy of the other. The conflict should be resolved by applying the law of the jurisdiction whose interest would be more impaired if its law were not applied.

*Liew v. Official Receiver and Liquidator,* 685 F.2d 1192, 1196 (9th

Cir.1982) (footnotes omitted); *see also Waggoner v. Snow, Becker,*

*Kroll, Klaris & Krauss,* 991 F.2d 1501, 1506-07 (9th Cir.1993).

"California will decline to apply its own law to a case brought in

California only if it is shown that another state has a greater

interest in having its law applied."[6] *In re Aircrash,* 684 F.2d at

1307; *see also Nelson v. Tiffany Industries, Inc.,* 778 F.2d 533,

534 (9th Cir.1985).

Employing that test, the parties—and we—agree that the laws

of California and Texas, on the one hand, and Illinois, on the

other hand, differ with regard to the effect of a limitations

---

[6]There appears to be some dissonance between the affirmative hue of the "greater interest" standard pronounced in *In re Aircrash* and the negatively phrased "impairment" formulation in *Liew,* but any such difference seems more theoretical and semantic than real. In any event, in this case we reach the same result regardless of the phraseology employed.

defense upon IIC's claim in this case.[7]

It also seems clear that the district court was correct in concluding that each of the three states possesses some interest in the application of its own statute of limitations in this case. Among the fundamental purposes underlying a state's statute of limitations is the protection of the resident defendants of that state and of that state's courts from the burdens of dealing with stale claims. *See Ledesma v. Jack Stewart Produce, Inc.,* 816 F.2d 482, 485 (9th Cir.1987); *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex.1990); *Ashland Chem. Co. v. Provence,* 129 Cal.App.3d 790, 181 Cal.Rptr. 340, 341 (1982); *Dolce,* 60

---

[7]At the time when this action was filed, legal malpractice suits in Illinois were governed by a statute covering actions upon unwritten contracts which allowed five years after the cause of action accrued. *See* Ill.Rev.Stat. ch. 110, para. 13-205 (1983); *Dolce v. Gamberdino,* 60 Ill.App.3d 124, 17 Ill.Dec. 274, 276, 376 N.E.2d 273, 275 (1978). Effective January 1, 1991, Illinois adopted a statute specifically to deal with cases of attorney malpractice. The new statute, which only applies prospectively, *see Gould v. Sachnoff & Weaver, Ltd.,* 240 Ill.App.3d 243, 180 Ill.Dec. 805, 807, 607 N.E.2d 1318, 1320 (1992), affords only two years within which aggrieved clients can bring suit, although it may liberalize requirements for suit in other ways. *See* Ill.Rev.Stat. ch. 110, par. 13-214.3 (1991).

California and Texas apparently allow one and two years respectively for potential plaintiffs to bring suit based upon attorney malfeasance. Both parties concede, and the district court agreed, that, for purposes of the within case, identical results stem from both the Texas and California statutes. For that reason, the district court declined, as does this Court, to choose which of those two states' statutes governs in this case. *See, e.g., Fed. Depos. Ins. Corp. v. Cardinal Oil Well Servicing Co., Inc.,* 837 F.2d 1369, 1370 n. 1 (5th Cir.1988); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 724 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). The sole question for decision centers on whether Illinois's interest in applying its law outweighs the interests of either and both of California and Texas.

Ill.App.3d 124, 17 Ill.Dec. at 277, 376 N.E.2d at 276; *Davies v. Krasna,* 14 Cal.3d 502, 125 Cal.Rptr. 705, 712, 535 P.2d 1161, 1168 (1975). California possesses a plausible interest in the litigation given the fact that the instant case arose in a court located in California. As the subsequent removal of this action to federal district court in California was predicated upon diversity-of-citizenship jurisdiction, notwithstanding the fact that it subsequently was transferred to a federal court in Texas, California is regarded as the forum state.[8] *See, e.g., KL Group,* 829 F.2d at 915; *Cowan,* 713 F.2d at 104 n. 6. IIC's incorporation in California also may play a role in evaluating California's degree of interest, although, as IIC would be harmed by the application of its state's laws (see the discussion *infra* in Part III of this Opinion), California's interests might be better served by the application of *Illinois's* statute.[9] Texas also has an

[8]"While the processing of the claim in this case would affect a federal and not a California court, a federal court sitting in diversity applies 'governmental interest' analysis as would a California court." *Ledesma,* 816 F.2d at 485 n. 4.

[9]A state has an "interest in allowing its residents to recover for injuries sustained in a state that would recognize their claim as timely." *See Ledesma,* 816 F.2d at 485. *But cf. James v. Bell Helicopter Co.,* 715 F.2d 166, 172-73 n. 6 (5th Cir.1983) (noting that "California courts have tended to apply the law of the place of the injured's domicile" in order to aid recovery for injuries, but adding that that approach tends to apply only to "injured plaintiffs suing for personal injuries, as opposed to a commercial" plaintiff). In any event, the interest of a state in the application of its own particular statute of limitations on behalf of a resident plaintiff is weaker than if that interest stemmed from the involvement of a resident defendant. *See Ledesma,* 816 F.2d at 485 (stating that the fact that plaintiffs reside in California "weaken[s] the forum state's interest in [applying] its own statute of limitations" in comparison to an earlier decision which involved a California

8

interest in this litigation in that the underlying transaction giving rise to this action occurred within its borders and at least some of the negligent acts or omissions alleged against appellees transpired there as well. Finally, Illinois can demonstrate an interest in applying its statute of limitations in the light of the domiciles there of appellees and of the possibility that some of the allegedly negligent acts and/or omissions took place, at least in part, in that jurisdiction.[10] Additionally, IIC asserts an Illinois interest, which it contends is reflected in the statute of limitations, in regulating its attorneys and preventing misconduct. That assertion will be discussed *infra* in the context of weighing the competing interests.

It seems apparent from the foregoing summary discussion that this case involves a "true conflict," *Liew,* 685 F.2d at 1196, and therefore requires an evaluation of which state's interest would be

_____

resident as defendant).

[10]Appellant contends that several of the negligent acts occurred in Illinois, based upon appellant's seemingly correct factual assertions that telephone calls from appellees to IIC were placed from Chapman & Cutler's home office in Chicago, and that appellees' failure to advise IIC (*ie.* their omissions) likewise to some extent can be grounded in Illinois. Appellees, in their brief and in a motion to strike filed with this Court, protest that those assertions represent new arguments not pressed in any court prior to the within appeal and that the declarations cited in support of those theories are not part of the summary judgment record. Specifically, appellees argue that at no time prior to this appeal did IIC raise the possibility that the claimed negligent acts took place in Illinois and that at no time before the present appeal did IIC allege negligent omissions on the part of appellees. As mentioned in note 4 *supra,* this Court herein affirms the grant of summary judgment even in the face of appellant's additional contentions and therefore regards appellees' motion to strike as moot.

most impaired by the application of another state's statute.

III.

California seems to manifest countervailing considerations in the within case which tug in both the directions of applying its own statute of limitations and of utilizing that of Illinois. For example, California's imputed desire to assist its resident plaintiffs in achieving recompense for their injuries, by applying whatever statute would allow such recovery, militates in favor of the use of the Illinois statute.[11] Nevertheless, one of the primary goals of a state's statute of limitations, *i.e.* the diminution of burdens upon that state's courts stemming from the prosecution of old claims, *see, e.g., Ledesma,* 816 F.2d at 485, as well as California's status as the forum state, cuts even more strongly in favor of applying the California statute. *See Rosenthal v. Fonda,* 862 F.2d 1398, 1402 (9th Cir.1988); *In re Yagman,* 796 F.2d 1165, 1171 (9th Cir.1986), *cert. denied,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987); *American Bank of Commerce v. Corondoni,* 169 Cal.App.3d 368, 215 Cal.Rptr. 331, 333 (1985).

Texas, despite appellant's vigorous assertions to the contrary, possesses a powerful interest in encouraging the use of its statute in this case. The underlying acts from which the claims of legal malpractice arose, namely the Frisco transactions between IIC and Box, took place in Texas. The land used as

---

[11]However, that interest seems to apply most strongly in cases of individual plaintiffs who seek recompense for some personal injury, rather than in situations involving a corporate plaintiff, as is the situation herein. *See* note 9, *supra.*

10

collateral was located there, extensive negotiations took place there, and the closing documents were signed in Texas.  More importantly, many of the alleged acts which IIC claims constituted malpractice by appellees took place in Texas.  Although the telephone calls rendering legal advice to appellant during its negotiations with Box appear to have originated in Chicago, the advice was received and discussed in Texas, and the injury effectively seems to have been completed in Texas.[12]  Appellees, by venturing into the legal market in Texas through their involvement in Texas-based transactions, and by undertaking to represent a California corporation as client, subject themselves to the laws of those states.  In this case, such redounds to their benefit.

The Ninth Circuit, in *Yagman,* 796 F.2d at 1170-71, utilized a similar analysis in determining the locus of the action in that case.  In so doing, the Ninth Circuit, in construing California's

---

[12]*Stavriotis v. Litwin,* 710 F.Supp. 216 (N.D.Ill.1988), *aff'd, Carmel v. Clapp & Eisenberg, P.C.,* 960 F.2d 698 (7th Cir.1992), is of little or no aid to appellant herein.  In that case, the court determined that the failure to act giving rise to the suit by a former client against his attorneys should be attributed to New Jersey, which was the location of defendants' law offices. *See id.* at 219.  Defendants in *Stavriotis* admitted that they provided most services to plaintiff at their New Jersey office and were licensed to practice only in New Jersey.  The court in that case stated that, under the "most significant relationship" test which the court employed as its choice-of-law analysis, the place with "the most significant relationship to this action is the place where the conduct causing the injury occurred." *Id.*  Also in *Stavriotis,* the New Jersey legal malpractice limitations period was six years, and the Illinois period was five years, rendering the Illinois Borrowing Act, which permitted the use of a foreign statute under certain circumstances, inapplicable by its own terms because the otherwise applicable foreign (New Jersey) statute was longer, not shorter, than that of Illinois. *Id.* at 219-20.

11

choice-of-law approach in a defamation case which did not involve a statute of limitations, stated that, even though the alleged defamatory remarks were made by New York defendants in New York, they were tied more closely to California, the home of the plaintiffs, as "it is the state where the damage to plaintiffs' reputations, if any, would have occurred....  New York has "absolutely no interest in the reputation of a California citizen.' "  *Yagman,* 796 F.2d at 1171 (quoting transcript in that case). Similarly here, the damage was incurred by a California plaintiff, IIC, and stemmed from a Texas transaction;  it bore little relation to Illinois.[13]

"Texas also has an overriding interest in governing the conduct of persons situated within its borders.  Moreover, persons within Texas, regardless of whether or not they are citizens, have a right to rely on and to act in conformity with Texas' laws. Hence, Texas has a real interest in seeing its laws applied." *Becker v. Computer Sciences Corp.,* 541 F.Supp. 694, 705 (S.D.Tex.1982).[14]  In the case at bar, the advice, or lack thereof, provided by appellees centered around a transaction in Texas for a client who, during the period in question, was visiting Texas in order to consummate or to terminate the deal and therefore implicates substantial interests of that state.

---

[13]Of course, appellants maintain that one of Illinois's principal interests arises from its legitimate purpose of regulating its own attorneys.  That contention is discussed *infra.*

[14]*Becker* did not involve a statute of limitations question.

12

Finally, Illinois does possess an interest of its own in the instant proceedings, since Illinois, as do all states, has an interest in regulating its attorneys. *See, e.g., Waggoner,* 991 F.2d at 1508; *Santos v. Sacks,* 697 F.Supp. 275, 284 (E.D.La.1988). Nonetheless, the question remains as to whether Illinois sought to accomplish that goal through its statute of limitations. The fact that, until recently, Illinois did not possess a statute of limitations specifically addressed to cases of legal malpractice is not fatal to appellant's claim; Illinois courts apparently have construed that state's general statute dealing with unwritten contracts to apply to cases of legal malpractice since at least 1912, *see Maloney v. Graham,* 171 Ill.App. 409 (1912), and that judicial construction, left undisturbed by the legislature, fairly can be said to reflect legislative intent in that respect. *See Miller v. Lockett,* 98 Ill.2d 478, 75 Ill.Dec. 224, 227, 457 N.E.2d 14, 17 (1983). In any event, appellant offers no evidence that a motivation to regulate the Illinois bar underlay either the old or the new Illinois statute; in fact, that new statute *shortens* the amount of time during which an aggrieved client may bring suit against an allegedly remiss attorney, indicating that the statute perhaps was impelled by factors other than a desire to extend greater protection to the public from errant lawyers.[15]

---

[15]In fact, appellees, in their brief filed with this Court refer to certain portions of the legislative history of the newly enacted statute as probative evidence that the change was motivated by concerns over the perceived ill effects of excessive malpractice liability and was intended to shelter attorneys from stale claims and the public from increased attorney fees associated with excessive malpractice premiums. *See* Illinois

13

Some of the acts by appellees of which appellant complains, as well as appellees' purported failure to act, may, of course, be attributable to the home office of appellees in Illinois. However, as explained *supra,* the bulk of such attribution seems to lie more appropriately with Texas or California. Accordingly, we look to California or Texas, rather than to Illinois, law as the governing law in this case.

IV.

Having decided that either the California or Texas limitations statutes apply, we now must ascertain when appellant sustained damages from appellees' asserted misconduct so as to trigger the running of one or both of those statutes, in order to determine whether the district court below correctly concluded that, under either statute, appellant's claim is barred as untimely.

IIC insists that it suffered no damage until Box and the other companies defaulted upon the notes, at which time ICC was forced to pay the entire $120 million. Appellees offer several alternative trigger dates, including the date upon which IIC entered into the allegedly faulty agreement with Box and his affiliated companies, either because of the mere act of signing that agreement or due to the immediate financial harm incurred by IIC as a result of that

---

State Senate, 86th General Assembly, 106th Legislative Day, at 33-34 (June 21, 1990) (statements of Sens. Marovitz and Barkhausen). The cited history also reveals that the new statute was proposed by the Illinois State Bar Association. *Id.* While that fact in itself is not controlling, appellant has not proffered any legislative history surrounding the adoption of the new statute which affirmatively supports its position that a desire further to regulate the bar was a purpose of the law.

14

agreement[16];  the date IIC began accumulating legal and other fees as a result of its investigations, which included an examination of the Frisco transaction;  the closing of IIC's financial guarantee operations;  and the establishment of a reserve by IIC's parent, Crum & Forster, in part to protect against future liability in connection with the Frisco deal.

Appellant brought suit in the within action on April 6, 1989. Accordingly, if appellees correctly have identified any of the above events as trigger dates for the limitations period, IIC's claims would be barred under both the Texas and California statutes, as all of the listed events transpired before April 1987.

Both California and Texas apply similar rules to determine when a cause of action accrues for purposes of application of their respective statutes of limitations.  For ease of analysis, we take up each in turn.

V.

California law provides in pertinent part:

(a) An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first....  The period shall be tolled during the time that any

---

[16]That category of harm encompasses the insufficiency of the collateral;  the failure of appellees to ensure that Box was required to use the funds generated from the transaction to improve and/or to develop the Frisco collateral;  the lack of recourse to, or indemnity from, Box or any of his companies;  the generally riskier nature of IIC's guarantee as a result of the above-listed deficiencies;  and the consequent drop in value of the guarantee on the reinsurance market.

15

of the following exists:

(1) The plaintiff has not sustained actual injury.

Cal.Civ.Proc.Code § 340.6(a) (West 1982).

In this case, appellant contends that no "actual injury" arose until it was forced to pay in October 1988 (less than a year before appellant instituted this case in April 1989) the $120 million it had guaranteed under the promissory notes.[17]

> Ordinarily, the determination of the time when a plaintiff suffered damages giving rise to a cause of action for attorney malpractice is a question of fact, but where there are no triable issues of fact as to when the plaintiff suffered such damage then a court may determine this as a matter of law.

*Johnson v. Simonelli,* 231 Cal.App.3d 105, 282 Cal.Rptr. 205, 208 (1991).

A determination of actual injury does not require that the amount of said damages be ascertained, nor is it " "necessary that all or even the greater part of the damages have to occur before the cause of action arises.' " *United States v. Gutterman,* 701 F.2d 104, 106 (9th Cir.1983) (quoting *Bell v. Hummel and Pappas,* 136 Cal.App.3d 1009, 186 Cal.Rptr. 688, 694 (1982)); *see also Davies,* 125 Cal.Rptr. at 713, 535 P.2d at 1169; *Budd v. Nixen,* 6 Cal.3d 195, 98 Cal.Rptr. 849, 852, 491 P.2d 433, 436 (1971). "[I]t

---

[17]As the district court noted in its Memorandum Order granting summary judgment to appellees, "IIC does not dispute that it had knowledge of the facts upon which its claim of negligence is based in 1984, or at the latest in 1986, after IIC had at least twelve attorneys investigate the transaction." Consequently, in order to escape proscription under the statute, because IIC discovered the alleged negligence more than one year before filing suit, IIC must demonstrate that no actual injury occurred until a later date.

16

is the fact and knowledge of damage and not the amount thereof that is required to prove actual injury." *Bennett v. McCall,* 19 Cal.App. 4th 122, 23 Cal.Rptr.2d 268, 271 (1993) (citing *Laird v. Blacker,* 2 Cal.4th 606, 7 Cal.Rptr.2d 550, 553, 555, 828 P.2d 691, 694, 696 (1992), *modified,* 2 Cal. 4th 1253, *cert. denied,* --- U.S. ----, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992)). The injury must be "objectively existing and not feigned or merely speculative, real and not imagined.... Asked differently, the question is whether we can say that, as of the relevant date, a reasonable person would have considered the injury to be real." *Laird v. Blacker,* 279 Cal.Rptr. 700, 710 (Cal.App.1991), *aff'd,* 2 Cal.4th 606, 7 Cal.Rptr.2d 550, 828 P.2d 691 (1992).

The payments by IIC of attorney fees and other costs in connection with its investigation of the Frisco transaction and of possible litigation in connection therewith seem the most persuasive examples of the occurrence of actual harm that was suggested by appellees. *See Sirott v. Latts,* 6 Cal.App.4th 923, 8 Cal.Rptr.2d 206, 209 (1992). Appellant raises two objections with regard to considering those fees as harm sufficient to trigger the limitations period. First, IIC claims that, because it received approximately $4.5 million in premium payments prior to the attorney-fee and investigative payments, it suffered no net loss in connection with the notes until after the default and thus cannot be considered to have incurred actual harm until that time. *See, e.g., Heckert v. MacDonald,* 208 Cal.App.3d 832, 256 Cal.Rptr. 369, 372-73 (1989) (labeling that principle the " "special benefit'

17

doctrine"). However, in *Sirott,* the Court of Appeal of California expressly rejected that argument in connection with a limitation issue in a case involving attorney fees incurred as a result of alleged malpractice.[18] *See Sirott,* 8 Cal.Rptr.2d at 209 (stating that "[a] client suffers damage when he is compelled, as a result of the attorney's error, to incur or pay attorney fees," even though those fees "did not exceed the ... premium plaintiff would have been required to pay had he not followed defendants' advice").

Second, IIC states that attorney fees are not recoverable pursuant to California law in this case, thereby eliminating them from consideration as actual harm. IIC contends that only fees arising under what it terms the third-party tort exception, *i.e.,* when "a defendant has wrongfully made it necessary for a plaintiff to sue a third person," may be recovered under California law, not fees incurred in the "ordinary two-party lawsuit." *Prentice v. N. American Title Guaranty Corp.,* 59 Cal.2d 618, 30 Cal.Rptr. at 823, 381 P.2d 645, 647 (1963). We agree that if IIC, in fact, were

---

[18]Appellant correctly notes that "[t]he decision of an intermediate appellate state court guides, but is not necessarily controlling upon, the federal court when determining what the applicable state law is." *Wood v. Armco, Inc.,* 814 F.2d 211, 213 n. 5 (5th Cir.1987). However, in this case, we see no reason to depart from the reasoning of the intermediate court. *See* 32 Am.Jur.2d *Fed.Pract. & Proced.* § 296 (1982) (footnotes omitted):

> In determining the law of a state, a federal court looks to the decisions of the lower state courts as well as to those of the state's highest court.... [A] federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court, even though the federal court thinks that the rule is unsound in principle or not the better rule.

unable to recover those fees from appellees, those fees would not seem to represent actual harm sufficient to confer upon IIC a cause of action and thereby to commence the limitations period. However, that objection fails for two reasons. The general proscription against recovery of fees appears to apply only in the context of fees spent in connection with actual litigation, or at least in contemplation thereof. *See, e.g., UMET Trust v. Santa Monica Medical Investment Co.,* 140 Cal.App.3d 864, 189 Cal.Rptr. 922, 927 (1983); *Prentice,* 30 Cal.Rptr. at 823, 381 P.2d at 647. Some of the expenditures by IIC involved the allocation of non-attorney employees to investigative tasks, and those costs, as well as others, do not seem to have been solely litigation-related in nature.[19] Furthermore, if any of those fees were spent for the purpose of evaluating possible litigation against Box and its affiliates, or against IIC's agent, FGC Services, those fees indeed may fall within the third-party tort exception, as the contemplated litigation would have been necessary only as a result of appellees' negligent conduct. *cf. UMET Trust,* 189 Cal.Rptr. at 927 (holding that when a lawsuit by a claimant against a third party "was not

---

[19]Appellant, in its brief filed with this Court, describes those costs as follows:

> In 1985 and 1986, employees of IIC and its parent corporations, along with outside attorneys, examined and investigated a number of the financial guarantees issued by IIC, including the Frisco Policies.... Their purpose was to learn more about the status and value of IIC's collateral, to determine whether IIC's rights had been abused in the Transaction and to assess the likelihood of a future claim under the Policies. The review also examined Chapman's role in the Frisco Transaction and potential, related litigation.

19

compelled or required ... to protect its own interests because of the wrongdoing of" the attorney, the third-party tort exception does not apply).

For the foregoing reasons, we locate the beginning of the "actual harm," suffered by appellant under California law because of appellees' allegedly deficient legal advice, with the time when the investigative and legal fees and expenses were incurred by appellant during 1985 and 1986.[20]

## VI.

In Texas, "[t]he prevailing view is that a cause of action for legal malpractice is in the nature of a tort and is thus governed by the two-year limitations statute." *Black v. Wills,* 758 S.W.2d 809, 814 (Tex.App. Dallas 1988); *see also Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). A plaintiff must suffer a "legal injury" before a cause of action accrues.[21] *Zidell v. Bird,* 692 S.W.2d 550, 555 (Tex.App. Austin 1985). "The fact that damage may continue to occur for an extended period ... does not

---

[20]Because we conclude that those fees and related expenses suffice as actual harm suffered by IIC, we need not further consider the validity of the other examples proffered by appellees.

[21]Texas law, like that of California, follows a "discovery rule" for purposes of the statute of limitations. *In re Gleasman,* 933 F.2d 1277, 1281 (5th Cir.1991). "[T]he limitations period begins to run when the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the injury." *Id.* Thus, in order to contest preclusion under the Texas statute, appellant must demonstrate that, despite appellant's knowledge of the alleged malpractice not later than 1986, no legal injury occurred until the default of the notes which did not occur until less than one year before appellant instituted this action in the California state court. *See* note 17, *supra.*

prevent limitations from starting to run. Limitations commences when the wrongful act occurs resulting in *some* damage to the plaintiff." *Murray,* 800 S.W.2d at 828 (emphasis added).[22]

In *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967), the Supreme Court of Texas stated that "a cause of action sounding in tort accrues ... notwithstanding the fact that the damages, or their extent, are not ascertainable until a later date" and quoted with approval from 54 C.J.S. *Limitations of Actions* § 168, pp. 122-123, the maxim that "the cause of action accrues, and the statute [of limitations] begins to run, when, and only when, the damages are sustained." *See also Cal. Fed. Mortgage Co. v. Street,* 824 S.W.2d 622, 627 (Tex.App. Austin 1991, writ denied); *Zidell,* 692

---

[22]Appellant's reliance upon the cases of *Hughes v. Mahaney and Higgins,* 821 S.W.2d 154 (Tex.1991), *Aduddell v. Parkhill,* 821 S.W.2d 158 (Tex.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 2998, 120 L.Ed.2d 874 (1992), and *Gulf Coast Investment Corp. v. Brown,* 821 S.W.2d 159 (Tex.1991), is misplaced. Those decisions together set forth the proposition "that when an attorney commits malpractice in the prosecution or defense of a claim that results in litigation, the statute of limitations on the malpractice claim against the attorney is tolled until all appeals on the underlying claim are exhausted." *Hughes,* 821 S.W.2d at 157. *Gulf Coast* applied that stay in the limitations period to include wrongful foreclosure actions brought against the client as a result of the attorney's malpractice. *See Gulf Coast,* 821 S.W.2d at 160. The Supreme Court of Texas, in *Hughes,* explained the rule as stemming from the desire to allow the client to avoid "adopting inherently inconsistent litigation postures in the underlying case [against the third party] and in the malpractice case." *Hughes,* 821 S.W.2d at 156. In this case, no litigation between IIC and any of the other parties to the Frisco transaction has transpired, so cases such as *Hughes* seem inapplicable herein. *See Hoover v. Gregory,* 835 S.W.2d 668, 675 (Tex.App. Dallas 1992, writ denied) (commenting that "[w]e interpret *Hughes* narrowly as controlling in legal malpractice cases when a malpractice suit is brought against an attorney *in the course of litigating the complainant's underlying claim* ") (emphasis added).

21

S.W.2d at 558. Nor does *Peterson v. Dean Witter Reynolds, Inc.,* 805 S.W.2d 541, 549 (Tex.App. Dallas 1991), in which clients were denied the right to recover attorney fees "expended in prior litigation with third parties," appear to prevent the fees in this case from constituting actionable injury. At least a portion of the fees incurred by IIC appear to have been non-legal in nature, and another segment of the costs do not seem to have been part of any litigation or anticipated litigation.[23] In that context, IIC's payments of investigative fees and related costs in 1985 and 1986 provide a sufficient trigger for the Texas statute, as well as for the California statute.[24]

## VII.

IIC's investigative expenditures and related costs, incurred during the period of 1985-1986, comprised "actual harm" and "legal injury" sufficient to commence the running of each and both of

---

[23]*See* note 19, *supra.*

[24]We note that Texas law may treat the mere act of signing the agreements in the Frisco transaction as injury sufficient to begin the limitations period. *See American Medical Electronics, Inc. v. Korn,* 819 S.W.2d 573, 578 (Tex.App. Dallas 1991, writ denied) (asserting that "[t]he initial damage to [plaintiff], although perhaps nominal, occurred when its right to receive professional and complete advice from its attorneys was violated" in connection with plaintiff's decision to sign an assignment agreement, and stating that limitations began to run when plaintiff discovered that the advice it had received was erroneous); *see also Zidell,* 692 S.W.2d at 558 (asserting that plaintiffs' cause of action against attorney accrued when plaintiffs acted upon the negligent advice of counsel and signed a contract which "irrevocably" prevented them, "if called upon to do so," from performing an earlier contractual obligation); *cf. Hoover,* 835 S.W.2d at 673 (construing *Atkins* and subsequent case law to focus upon "creation and notice of a *risk* of harm, not a finally established or inevitable harm").

22

California's and Texas's limitations periods.  Accordingly, because appellant's cause of action was foreclosed by both states' statutes of limitations, and because we deem said statutes, rather than that of Illinois, to be applicable in this case, we hereby affirm the grant of summary judgment by the district court below in favor of appellees.

AFFIRMED.