DRUMMOND CARRIAGE COMPANY ET AL. V. GEORGE T. MILLS.

FILED APRIL 8, 1898.   No. 7846.

1. **Appeal Bond:** JUDGMENT AGAINST SURETIES. Upon the rendition of a judgment against appellant in the district court, that court has no such jurisdiction of the person of the surety in the appeal undertaking that it may render the same judgment against him that it may against the appellant. *Selby v. McQuillan*, 45 Neb. 512, followed.

2. **Bailment:** LIEN OF BAILEE FOR SERVICES. By operation of the common law, in the absence of any specific agreement, every person who has bestowed labor and skill on a chattel bailed to him for the purpose, and has thereby increased its value, has a lien on such chattel and may retain it until paid his reasonable charges for his services.

3. ———: ———. Such rule of the common law is in force in this state.

4. ———: ———: STATUTORY LIENS. The common-law lien to which we have just referred may, by force of special facts or circum-

stances, override or be superior to prior contractual or statutory liens.

5. **Chattel Mortgages: Title.** In this state the title to mortgaged chattels remains in the mortgagor until foreclosure of the mortgage.

6. ———: **Lien of Bailee for Repairs: Priority.** A physician gave a mortgage on a buggy of which he retained possession and used it in his business. It was of the recitals of the mortgage that he should not so negligently or improperly use or care for the property as to subject it to probable loss or material depreciation in value, and the mortgagee had knowledge that the buggy at times needed repairing; and had seen it at one time left at the shop to be repaired. The mortgagor, without the knowledge of the mortgagee, left the buggy with a carriage company for needed repairs. The company repaired the buggy and retained possession thereof to enforce a claimed lien for, or the payment of its reasonable charges for, such repairing. The mortgagee instituted an action of replevin against the carriage company to obtain possession of the buggy, asserting right thereto under and by virtue of his mortgage lien. *Held,* That the mortgage lien was subordinate to the common-law lien, since the recitals of the mortgage and the facts and circumstances disclosed that the mortgagor had at least implied authority from the mortgagee to have the repairs made.

Error from the district court of Douglas county. Tried below before Ambrose, J. *Reversed.*

*B. N. Robertson,* for plaintiffs in error.

*W. H. De France, contra.*

Harrison, C. J.

This, an action of replevin, was instituted by defendant in error March 22, 1894, before a justice of the peace in Douglas county to recover the possession of a "Breton buggy," and in a trial he was given judgment for the relief demanded. An appeal was perfected to the district court, wherein the defendant in error was again successful. He there obtained judgment against the carriage company and also against the surety on the appeal undertaking. The carriage company and the surety on the appeal bond present the case to this court for review.

It is contended for the party who signed the appeal

undertaking that the district court had no jurisdiction to render the judgment it did against him. The question presented was discussed and determined in the case of *Selby v. McQuillan,* reported in 45 Neb. 512, and it was stated that the district court, on the rendition of a judgment against an appellant, had no jurisdiction to render a like judgment against the surety in the appeal bond; and, following the doctrine then announced, we must hold that the judgment against the surety in this case was without the jurisdiction of the court and cannot stand.

The trial in the district court was without a jury and on an agreed statement of the facts as follows:

"That W. P. Wilcox was, on and prior to July 1, 1891, a physician engaged in the actual practice of his profession in the city of Omaha, Nebraska; that on September 12, 1889, said Wilcox purchased a physician's phaeton, or carriage, from the defendant, and that from the date of its purchase until on or about the 13th day of May, 1892, the said Dr. Wilcox used the said carriage in his professional business as a physician and surgeon; that on July 1, 1891, said Dr. W. P. Wilcox made, executed, and delivered, for a valuable consideration, being money actually loaned, his certain promissory note to the plaintiff for $350, due one year after date; that no payments have been made on said note, and the same is due. To secure said note the said Dr. W. P. Wilcox made and delivered a chattel mortgage to plaintiff covering the said physician's phaeton, or carriage, a horse and harness. The said mortgage was filed in the office of the county clerk of Douglas county, Nebraska, in accordance with law, on the 3d day of August, 1891, a copy of which is hereto attached and made a part of this stipulation, marked 'Exhibit A.'

"The plaintiff was well acquainted with the buggy in controversy and knew at the time he took his mortgage that it was used by Dr. Wilcox in his business as a physician. Dr. Wilcox and the plaintiff rode out in the buggy quite frequently in the evenings. The plaintiff

was with Dr. Wilcox at the office of the Drummond Carriage Works, defendant, at one time previous to May, 1892, after his mortgage was given, and when Dr. Wilcox run the buggy in there for repairs, which bill of repairs was paid by Dr. Wilcox. About the 13th of May, 1892, said Dr. Wilcox took the buggy mentioned in the mortgage, and in controversy herein, to the defendant for repairs, and, pursuant to agreement between the defendant and Dr. Wilcox, the buggy was to be repaired. The bill for the same agreed upon was $60, tó be paid in cash when the work was done. A copy of the memorandum of repairs to be done, and which were actually done, on the carriage, is hereto attached, marked 'Exhibit B' and made a part of this stipulation. The original was, on or about May 13, 1892, mailed by defendant to Dr. Wilcox. The repairs done on the buggy were reasonably necessary for the careful preservation of the carriage, and the bill for the same is well and reasonably worth $60, no part of which has been paid. The buggy was completed, and the bill was due on the 1st of July, 1892. The plaintiff is a resident of Omaha, Nebraska, and has resided therein ever since the 12th day of September, 1889.

"About the 1st of June, 1892, said Dr. W. P. Wilcox left the city of Omaha for Colorado, to be gone an indefinite period of time. Said Dr. Wilcox was absent from the city from about the 1st of June, 1892, until about the 15th of March, 1894. During the time of said Wilcox' absence from the city, as aforesaid, the plaintiff supposed the buggy was in the barn of the father of said Wilcox, and did not know different until about the 21st of March, 1894, when he was notified by said Wilcox that the said buggy was in the possession of the defendant. In the meantime, the plaintiff had made no inquiries about the whereabouts of the buggy, neither had he made any inquiries about the horse and harness, and when this action was commenced the plaintiff did not know where the horse and harness were. Plaintiff never has pressed the said Wilcox for the money secured by the

note and chattel mortgage and never calculated to do so. While Dr. Wilcox was using the buggy in his professional business, he had all his repairing done at the carriage works of the defendant, and the buggy was in the defendant's shop for repairs, and the defendant did small repair work on the buggy twelve different times between the date of its purchase, September 12, 1889, and May 1, 1891. The first actual knowledge that the plaintiff had of the buggy being in the possession of the defendant was obtained from the said Dr. Wilcox on or about March 21, 1894. Immediately after said notification, plaintiff demanded possession of said buggy from defendant, and upon refusal of defendant to deliver up the possession of said buggy to plaintiff, plaintiff commenced this cause of action. The defendant made no inquiries of Wilcox when he took the buggy to its place of business for repairs, as to whether the buggy was incumbered or not, nor did the said Wilcox say anything about it to the defendant. The buggy has been in the continuous possession of the defendant from the spring of 1892. The defendant is a corporation duly organized under the laws of Nebraska, and engaged in the manufacture and sale and general repair work of wagons, carriages, and other kinds of vehicles. The defendant, when demand was made on it for the possession of the buggy, refused to deliver the same to the plaintiff until its bill for repairs, as above stated, was paid, and then and there notified the plaintiff that it claimed a lien upon said buggy for the work and labor and material performed and used in repairing said buggy. The value of the buggy was $75 at the commencement of this action. The defendant and all the officers thereof, at the times when said repairs were agreed upon and made, had no actual knowledge of said mortgage, nor were they aware of the existence of such a mortgage until the month of March, 1894."

It is urged by counsel for the carriage company that it had a lien by force of law on the buggy for the amount of its bill of charges for repairing the buggy, which contin-

ued so long as it retained possession of the buggy under a claim of lien for such services. The principle invoked is, if property is delivered to a person to be by his skill and labor or by adding thereto property of his, enhanced in value, and he performs the labor or adds his own property to that delivered and thereby increases the value of the latter, he may retain possession of it until paid for his labor or materials. This is a doctrine of the common law, and the right is usually denominated a common-law lien, and it exists under a state of facts such as we have just detailed, unless there is a contract inconsistent with such lien, or some modifying circumstances which are in conflict with any such right, or disclose an intent not to claim the right. "A mechanic of any kind has a lien upon all personal property for manufacture or repairs, while it remains in his possession. * * * A carriage-maker for repairs upon a carriage." (See 6 Wait, Actions & Defenses 149, and cases cited.) Persons have by common law the right to detain goods on which they have bestowed labor, until the reasonable charges therefor are paid. (2 Kent, Commentaries 635.) In the absence of specific agreement, if a party has bestowed labor and skill on a chattel bailed to him for such purpose and thereby improved it, he has by general law a lien on it for the reasonable value of his labor or the right to retain it until paid for such skill and labor. (*Bevan v. Waters*, 3 C. & P. [Eng.] 520; *Scarfe v. Morgan*, 4 M. & W. [Eng.] 270; *Lord v. Jones*, 24 Me., 439, 41 Am. Dec. 391; *Grinnell v. Cook*, 3 Hill [N. Y.] 491. This right rests on principles of natural equity and commercial necessity. (2 Kent, Commentaries 634.) No lien exists at common law for the agistment of cattle (*Chapman v. Allen*, 2 Cro. Car. [Eng.] 271; *Jackson v. Cummins*, 5 M. & W. [Eng.] 342; *Wallace v. Woodgate*, 1 C. & P. [Eng.] 575); nor in favor of one to whom a horse has been delivered to be stabled, taken care of, fed, and kept (*Judson v. Etheridge*, 1 C. M. [Eng.] 742). In such cases, a lien for the charges will only arise by virtue of a statute or special agreement in

the nature of a pledge. * * * 'The case of an agist-
ment does not fall within that principle inasmuch as the
agister does not confer any additional value on the ar-
ticle, either by the exertion of any skill of his own or
indirectly, by means of any instrument in his posses-
sion.' " (*White v. Smith*, 43 Am. Rep. [N. J.] 347; *Jackson
v. Cummins, supra.*)

We refer to the agister's lien for the purpose of direct-
ing attention to the fact that it is not a lien which has
been recognized as arising by force of the general or com-
mon law or as having any existence at common law, but
has its origin in, or is the creature of, statutory provision,
and that the reasoning employed and rules announced by
this court in reference to agister's liens are not forceful or
applicable herein in regard to the lien claimed. The leg-
islature of the territory, when the state was a territory,
passed the following act: "So much of the common law
of England as is applicable and not inconsistent with the
constitution of the United States, with the organic law
of this territory, or with any law passed or to be passed
by the legislature of this territory is adopted and de-
clared to be law within said territory." (Compiled Stat-
utes, ch. 15, sec. 1.) The right to the common-law lien
would exist in this state unless inconsistent with our stat-
utory law, and we cannot discover wherein it is inconsist-
ent with, or has been abrogated by, statute, hence must
determine it in force. In regard to the recognition and
enforcement of common-law rules, it is said by this court
in the opinion in the case of *Wilson v. Burnstead*, 12 Neb.
1: "In the application of the principles of the common
law, where the precedents are unanimous in the support
of a proposition, there is no safety but in a strict ad-
herence to such precedents. If the court will not follow
established rules, rights are sacrificed, and lawyers and
litigants are left in doubt and uncertainty while there
is no certainty in regard to what, upon a given state of
facts, the decision of the court will be." We must con-
clude that a common-law lien existed in favor of the

carriage company for the amount due it for the repair of the buggy; and it remains further to determine whether it took precedence of the lien of defendant in error's chattel mortgage. The lien of the mortgage was created and perfected by the filing prescribed by law, long prior to the services, etc., of the carriage company in repairing the buggy, and there is no dispute in regard to time of attachment of either lien.

It now becomes necessary to allude again to some of the facts which appeared of evidence in the cause, more especially to bring out distinctly the position occupied by defendant in error relative to any repairs which became necessary to the useful existence of the buggy, and its possible future appropriation to the satisfaction of the indebtedness, the payment of which was secured by the chattel mortgage. The mortgage provided in terms that until default by the mortgagor in the performance of specified conditions or until the happening of certain indicated events, he should keep possession of the mortgaged property, and one of the enumerated events by the occurrence of which the mortgagee should at his option be entitled to take possession thereof was this: "If the said party of the first part [the mortgagor] shall so negligently or improperly use or care for said property as to subject the same to probable loss or material depreciation of the value thereof—" from which it seems probable that it was in contemplation of the parties that the mortgagor would, of course at his own proper cost and charge have the buggy repaired, if necessary, during the time of its use by him and the existence of the mortgage. It was also of the evidence that defendant in error saw the buggy and rode in it frequently, and had knowledge of its being repaired by the carriage company at least once when he was present and it was run into the carriage company's place of business to be by it repaired.

We may now turn to the rules of law which we deem applicable to the state of facts developed in evidence herein. The legal title to the buggy was in the mort-

gagor. He was the owner thereof. The mortgagee had but a lien thereon. (*Musser v. King*, 40 Neb. 892; *Randall v. Persons*, 42 Neb. 607; *Camp v. Pollock*, 45 Neb. 771; *Gould v. Armagost*, 46 Neb. 897.) It may be said that a lien which arises by force of the common law may be, under special circumstances, superior to prior existing contractual or statutory liens on the same property. In Darlington, Personal Property ,p. 48, it is stated on this subject: "And though in general a lien cannot be created without authority of the owner, liens for repairs take precedence of prior mortgages where such repairs were necessary for purposes within the intention of the mortgage; *e. g.*, repairs on vessels or carriages, which the mortgagor was to continue to use." A lien on property by operation of the common law may have precedence of an existing mortgage. (Jones, Chattel Mortgages sec. 474; Herman, Chattel Mortgages 308.) In the case of *White v. Smith*, 15 Vroom [N. J.] 105, 43 Am. Rep. 347, it was said: "*Williams v. Allsup*, 10 C. B. [N. S.] 417, is the leading case on this subject. In that case the plaintiff, a shipwright, retained a vessel for his charges for repairs, as against a mortgagee under a prior mortgage. The mortgage had been recorded pursuant to the merchants' shipping act. The vessel was left in the mortgagor's possession and control for use, and was condemned as unseaworthy. The shipwright's charges were for necessary repairs, made by the mortgagor's direction, without the knowledge of the mortgagee. The court sustained the shipwright's lien for repairs, against the claim of the mortgagee. The course of reasoning which led to this result, as expressed in the opinions of the judges, is as follows: Erle, C. J., said: 'I put my decision on the ground that the mortgagee, having allowed the mortgagor to continue in the apparent ownership of the vessel, making it a source of profit and a means of earning wherewithal to pay off the mortgage debt, the relation so created by implication entitles the mortgagor to do all that may be necessary to keep her in an efficient

state for that purpose.   The case states that the vessel
had been condemned as unseaworthy by the government
surveyor, and so was in a condition to be utterly unable
to earn freight or be an available security or any source
of profit at all.   Under these circumstances, the mort-
gagor did that which was obviously for the advantage
of all parties interested.   He puts her into the hands
of the defendant to be repaired, and according to all
ordinary usage, the defendant ought to have a right of
lien on the ship so that those who are interested in the
ship, and who will be benefited by the repairs, should not
be allowed to take her out of his hands without paying
for them.   *   *   *   It is to be observed that the money
expended in repairs adds to the value of the ship; and
looking to the rights and interests of the parties gen-
erally, it cannot be doubted that it is much to the ad-
vantage of the mortgagee that the mortgagor should be
held to have power to confer a right of lien on the ship
for repairs necessary to keep her seaworthy.'   Willes, J.,
said: 'By the permission of the mortgagees the mort-
gagor has the use of the vessel.   He has therefore a
right to use her in the way in which vessels are ordinarily
used.   Upon the facts which appear on this case, this
vessel could not be so used unless these repairs had been
done to her.   The state of the things therefore, seems to
involve the right of the mortgagor to get the vessel re-
paired, not on the credit of the mortgagees, but upon the
ordinary terms, subject to the shipwright's lien. It seems
to me that the case is the same as if the mortgagees had
been present when the order for repairs was given.'
Byles, J., said: 'As it is obvious that every ship will,
from time to time, require repairs, it seems but reasona-
ble, under circumstances like these, to infer that the mort-
gagor had authority from the mortgagees to cause such
repairs as should become necessary to be done, upon the
usual and ordinary terms.   Now what are the usual and
ordinary terms?   Why, that the person by whom the re-
pairs are ordered should alone be liable personally, but

that the shipwright should have a lien upon the ship for the work and labor he has expended on her. Nor are the mortgagees at all prejudicially affected thereby. They have a property augumented in value by the amount of the repairs.' " (See also *Scott v. Delahunt*, 5 Lans. [N. Y.] 372; *Hammond v. Danielson*, 126 Mass. 294; *Tucker v. Werner*, 21 N. Y. Supp. 264; *Corning v. Ashley*, 4 N. Y. Supp. 255, affirmed. See 24 N. E. Rep. 1100.) We are not holding that in all cases, or generally, the common-law lien will override and be superior to the prior chattel mortgage lien, but that in cases where the mortgagor can be said to have expressed or implied authority from the mortgagee to procure repairs to be made on the mort-gaged property it will be so. The carriage company was entitled to its lien, and it was superior to the lien of the chattel mortgage; hence the judgment of the district court was wrong and must be reversed.

REVERSED AND REMANDED.

RAGAN, C., dissents.