State of MONTANA, Plaintiff and
Counterclaim Defendant,

v.

ATLANTIC RICHFIELD COMPANY,
Defendant and Counterclaimant.

No. 3:83–CV–317.

United States District Court,
D. Montana.
Helena Division.

May 13, 2003.

BACKGROUND STATEMENT, FIND-
INGS OF FACT, CONCLUSIONS
OF LAW, MEMORANDUM AND
ORDER

HADDON, District Judge.

### INTRODUCTION

The State of Montana (Montana) asserts claims in this case against Atlantic Richfield Company (ARCO) based on the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601, *et seq.*, and its Montana counterpart the Comprehensive Environmental Cleanup and Responsibility Act (CECRA), Mont. Code Ann. § 75–10–701, *et seq.*, to recover damages for natural resource injuries that occurred in the Clark Fork River Basin as a result of mining and mineral processing by ARCO and its predecessors. ARCO pleaded a number of affirmative defenses and counterclaims in response.

### BACKGROUND

This case was commenced in 1983. It was then stayed, upon request of the parties, for approximately five years while Montana finalized its Remedial Investigation and Feasibility Study. The stay was lifted in December of 1989. Discovery and motions practice then ensued for approximately two years until the case was again stayed for settlement negotiations. Motion practice and discovery resumed in October of 1994. Trial commenced in March of 1997.

The evidentiary phase of the trial was divided into five segments: (1) aquatic resources; (2) terrestrial resources; (3) groundwater resources; (4) damages; and (5) counterclaims. The first three trial segments were further divided into two subsegments characterized as: (1) liability; and (2) injury/causation. The liability subsegments focused on ARCO's liability for certain releases of hazardous substances. The injury/causation subsegments focused on the determination and quantification of natural resource injuries alleged by Montana, and the causal connection, or lack thereof, between the alleged injuries and the referenced releases.

The aquatic resources' segment was tried before the Court between March 3, 1997, and June 4, 1997. The terrestrial segment was tried between November 3, 1997, and November 19, 1997. The groundwater segment was tried between January 12, 1998, and January 22, 1998. The Honorable Paul G. Hatfield was the presiding judge.

The parties engaged in extensive settlement negotiations following the trial on the first three segments. The negotiations culminated in the settlement of a number

of Montana's natural resource damage (NRD) claims and a number of ARCO's counterclaims. The terms of the settlement were embodied in two consent decrees which, after consideration of public comment, were entered by the Court on April 19, 1999. These consent decrees are referred to as the "Streamside Tailings Operable Unit Consent Decree" and the "State Consent Decree."

Some claims were not resolved by either consent decree. These unresolved claims included Montana's claims for restoration costs at the "Upland Areas." The State Consent Decree set forth a three-step procedure for resolving such claims: (1) the Environmental Protection Agency (EPA) was to issue a Record of Decision (ROD) describing the remedial action it proposed to undertake at the Upland Areas; (2) the parties were to review the ROD and attempt to settle Montana's claims for restoration costs; and (3) claims that failed to settle would be set for trial.

In August of 1999, the Court received notice that the parties were unable to settle Montana's claims for restoration costs at the Upland Areas. A Case Management Plan was then developed by the Court and the parties. The plan contemplated that the Court would first make a determination from the existing record on the liability, causation and injury components of the State's claims for restoration costs. A trial on the damage portion of the claims would follow if ARCO was found to be liable.

Judge Hatfield died in July of 2000 before ruling on the liability, causation and injury issues. The case was then reassigned to Judge Richard F. Cebull as magistrate judge, and later to me. In December of 2001, the parties agreed, by stipulation, that it would be appropriate, upon *de novo* assessment and consideration of the existing record, for this Court to determine whether ARCO was liable for restoration costs at the Upland Areas.

The trial record has been reviewed. Proposed Findings of Fact and Conclusions of Law, supporting briefs and a joint statement of undisputed facts have been submitted by the parties.

From the record, the Court makes the following:

### FINDINGS OF FACT

1. Montana holds certain natural resources located within its boundaries in trust for the benefit of the public.

2. ARCO is a corporation currently organized under the laws of the state of Delaware with its corporate headquarters in California.

3. Montana seeks to recover restoration cost damages for injuries to terrestrial natural resources on approximately 17.8 square miles of land near Anaconda, Montana, known as Mt. Haggin, Smelter Hill and Stucky Ridge. These three geographic areas are collectively referred to as the "Upland Areas."

4. The Mt. Haggin Area (approximately 4,000 acres) is located southeast of Anaconda. The Smelter Hill Area (approximately 4,600 acres) is located south of Anaconda; and the Stucky Ridge Area (approximately 2,400 acres) is located north of Anaconda.

5. Copper smelters operated continuously in or near Anaconda from 1884 to July 1, 1980. Smelting began with the construction and operation of the Upper "Old Works" in 1884, and later the "Lower Works" in 1888. In 1902, a larger smelter, originally known as the "Washoe Smelter," and later known as the "Anaconda Smelter," went into operation in Anaconda and the Old Works and Lower Works were shut down.

6. The Anaconda Smelter closed on July 1, 1980. It was demolished between 1983 and 1989.

7. The Old Works Smelter and the Anaconda Smelter were owned and operated by ARCO and its predecessors, The Anaconda Company (TAC) and the Anaconda Copper Mining Company (ACMC), between 1895 and July 1, 1980. The Old Works was operated by ACMC from 1895 until it closed in 1902. The Anaconda Smelter was operated by ACMC, TAC and ARCO, successively, from 1903 until July 1, 1980.

8. ARCO has succeeded to the liabilities of TAC and ACMC from the date of ACMC's incorporation in June of 1895.

9. The smelters, during operation and particularly prior to 1970, emitted smoke and fumes containing hazardous substances and large volumes of sulfur dioxide gas. The highest emission levels occurred during the period just before, during and shortly after World War I.

10. Smelter emissions injured the terrestrial natural resources in the Upland Areas between 1895 and July 1, 1980. A substantial majority of the injuries occurred in the early 1900's when the smelters operated without Cottrell precipitators or other pollution abatement devices.

11. Some re-releases of hazardous substances occurred in the Upland Areas both before and after December 11, 1980, as winds redeposited hazardous substances originally deposited on the soil via smelter emissions.

12. Montana produced no evidence that natural resources in the Upland Areas suffered new or additional injuries, destruction, or loss as a result of smelter emissions or re-releases of hazardous substances after December 11, 1980.

13. Conversely, ARCO presented evidence that when the Anaconda Smelter stopped operating in July of 1980, the condition of the natural resources in the Upland Areas stabilized and improved.

From the foregoing, the Court enters its:

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

2. Subsection 107(a) of CERCLA provides, in part, that owners and operators of facilities from which there are releases or threatened releases who cause response costs to be incurred, shall be liable for:

> (A) all costs of removal or remedial action incurred by the United States Government or a State . . .; [and]
>
> .    .    .    .    .
>
> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release[.]

42 U.S.C. § 9607(a),( 4)(A), (C)(2000).

■ 3. The term "facility" is defined by CERCLA to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed . . . ." 42 U.S.C. § 9601(9)(B)(2000). The Old Works Smelter and the Anaconda Smelter constitute a portion of a "facility" for purposes of CERCLA.

■ 4. The term "release" is defined by CERCLA to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . ." 42 U.S.C. § 9601(22)(2000). Releases of hazardous substances occurred at the Old

Works Smelter and the Anaconda Smelter while they were owned and operated by ARCO and its predecessors between 1895 and July 1, 1980.

5. The term "injury" is defined in the applicable Department of Interior (DOI) regulations as "a measurable adverse change, either long- or shortterm, in the chemical or physical quality or the viability of a natural resource resulting either directly or indirectly from ... [the] release of a hazardous substance ...." 43 C.F.R. § 11.14(v)(2002).

6. The term "damages" is defined by CERCLA to mean "damages for injury or loss of natural resources ...." 42 U.S.C. § 9601(6)(2000). DOI regulations define the term "damages" as: "the amount of money sought by the natural resource trustee as compensation for injury, destruction, or loss of natural resources ...." 43 C.F.R. § 11.14(1)(2002).

7. A natural resource damage claim may include the monies required to restore, replace or acquire an equivalent of the injured natural resource (restoration costs), the lost compensable value of the injured natural resource, and the reasonable and necessary costs incurred in assessing the natural resource damages. 43 C.F.R. §§ 11.15(a)(3), 11.80(b)(2002).

■ 8. Subsection 107(f)(1) of CERCLA, also known as the "wholly before" limitation, bars NRD liability for natural resource damages occurring wholly before December 11, 1980.

> There shall be no recovery under the authority of subparagraph (C) of subsection (a) of this section where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before December 11, 1980.

42 U.S.C. § 9607(f)(1)(2000).

■ 9. The date that natural resource damages "have occurred" for purposes of

Subsection 107(f) is to be determined by reference to the language of the statute and settled statutory construction and common law principles.

■ 10. Damages accrue or occur, including restoration costs, when the underlying injury occurs.

11. Montana's claims for restoration costs at the Upland Areas are barred by Section 107(f)(1) because the claims are based exclusively on preenactment injuries, destruction or loss, that is, injuries, destruction or loss which occurred before December 11, 1980. No evidence of postenactment injuries, destruction or loss was presented.

■ 12. Montana's state superfund statute, CECRA, was enacted in May of 1985. It became effective on July 1, 1985. Mont.Code Ann. § 75-10-701, *et seq* (2001).

13. CECRA may not be applied retroactively to preenactment conduct "unless expressly so declared." Mont.Code Ann. § 1-2-109 (2001).

14. CECRA does not declare that it is a retroactive statute. To the contrary, CECRA specifically provides that it is a prospective statute.

15. The Session Laws of Montana, which publish the actual enrolled bill passed by the Legislature, contain the official laws of the state. Mont.Code Ann. § 1-11-103(6)(2001).

16. Chapter 711 of the 1985 Montana Session Laws sets forth CECRA in its entirety, and includes the following language not published in the Montana Code Annotated:

> Section 8. **Saving clause.** This act does not affect rights and duties that matured, penalties that were incurred,

or proceedings that were begun before the effective date of this act.

1985 Mont. Laws 1613.

17. The "proceedings" in this matter began in December of 1983. CECRA's savings clause specifically states that CECRA does not affect proceedings begun before the effective date of the act. 1985 Mont. Laws 1613.

18. Montana failed to present any evidence that conduct by ARCO after July 1, 1985, caused injury to natural resources in the Upland Areas. Therefore, CECRA does not apply.

## *MEMORANDUM*

This case presented the basic question of when, under the "wholly before" limitation on damages in Section 107(f)(1) of CERCLA, 42 U.S.C. § 9607(f)(1), it is to be said that natural resource damages, as defined by CERCLA (42 U.S.C. § 9601(6)), "have occurred." The question has been neither spoken to nor resolved by the United States Supreme Court or any federal appellate court. This Court nevertheless concludes, notwithstanding that much has been written by courts and commentators about the difficulties in interpreting and applying the language found in CERCLA,[1] that the issue can be resolved by a straightforward application of the language of the act and established rules of statutory construction and common law to the record made at trial.

Analysis begins, as it must, with the language of the statute. *Bailey v. U.S.,* 516 U.S. 137, 144–45, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *Coronado–Durazo v. I.N.S.,* 123 F.3d 1322,

1324 (9th Cir.1997). Clear and explicit statutory language is to be applied as written. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). Terms utilized in the statute are to be construed according to their ordinary or natural meaning absent clearly expressed Congressional intent to the contrary. *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); *U.S. v. Alvarez–Sanchez,* 511 U.S. 350, 356–57, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). The statute says what it means and means what it says. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Moreover, if Congress has used a term in the statute that has a settled common law meaning, the Court is to accept that Congress meant to have that common law meaning applied, absent contrary indications in the statute itself. *U.S. v. Bestfoods,* 524 U.S. 51, 62–63, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)(refusing to abrogate application of common law principles in a CERCLA case); *Beck v. Prupis,* 529 U.S. 494, 500–01, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000); *Field v. Mans,* 516 U.S. 59, 69–70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *U.S. v. Shabani,* 513 U.S. 10, 13, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994); *U.S. v. Weaver,* 290 F.3d 1166, 1171 (9th Cir.2002); *see also Long Beach Unified Sch. Dist. v. Godwin Cal. Living Trust,* 32 F.3d 1364, 1368 (9th Cir.1994)(applying common law definitions to CERCLA terms).

It likewise is a well-settled principle of common law that the right to sue accrues and damages occur, even though the full extent of damages may not be quantified, when the injury takes place. *E.g. Nodine*

---

1. *See e.g. Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 883 (9th Cir.2001); *Artesian Water Co. v. Govt. of New Castle County,* 851 F.2d 643, 648 (3d Cir.1988); *Dedham Water Co. v. Cumberland Farms*

*Dairy, Inc.,* 805 F.2d 1074, 1080 (1st Cir. 1986); John Copeland Nagle, *CERCLA's Mistakes,* 38 Wm. & Mary L.Rev. 1405, 1405–11 (1997).

v. Shiley, Inc., 240 F.3d 1149, 1153 (9th Cir.2001); U.S. v. Gutterman, 701 F.2d 104, 106 (9th Cir.1983); Industrial Indemnity Co. v. Chapman and Cutler, 22 F.3d 1346, 1354 (5th Cir.1994); Union Pacific Railroad Co. v. Reilly Industries, Inc., 4 F.Supp.2d 860, 864–65 (D.Minn.1998), aff'd, 215 F.3d 830 (8th Cir.2000)(applying common law principles to Minnesota law based response cost damage claims). It is equally well-settled at common law that absent an injury, there can be no damages. E.g. Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40–41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Adams v. Bethlehem Steel Corp., 736 F.2d 992, 994 (4th Cir. 1984); Fredenberg v. Superior Bus Co., 631 F.Supp. 66, 68 (D.Mont.1986).

The plain language of Section 107(f)(1) precludes the recovery of natural resource damages which occurred "wholly before" December 11, 1980, the date of CERCLA's enactment. Artesian Water Co., 851 F.2d at 650; U.S. v. Olin Corp., 107 F.3d 1506, 1513 (11th Cir.1997)(noting that Congress included "an express limitation on retroactivity in the natural resource provision"); Continental Title Co. v. Peoples & Gas Light and Coke Co., 959 F.Supp. 893, 895–96 (N.D.Ill.1997)("Congress explicitly prohibited retroactive recovery of natural resource damages"); The Ninth Ave. Remedial Group v. Fiberbond Corp., 946 F.Supp. 651, 659 (N.D.Ind.1996)(Section 107(f) contains explicit limitation that natural resource damages apply prospectively); Nova Chemicals, Inc. v. GAF Corp., 945 F.Supp. 1098, 1101 (E.D.Tenn.1996)("[S]ection 107(f)(1) expressly states that natural resource damages which occurred prior to enactment of CERCLA are not recoverable"); Nevada Dept. of Transp. v. U.S., 925 F.Supp. 691, 694–95 (D.Nev.1996)(Sec-

tion 107(f) precludes retroactive application of CERCLA natural resource damages); Idaho v. Bunker Hill Co., 635 F.Supp. 665, 674 (D.Idaho 1986)(holding that "[d]amage to the environment (whether abated or not abated) which occurred prior to enactment" does not support NRD recovery). If no natural resource damages occurred after December 11, 1980, no claim under the act exists.

The term "occurred" as used in Section 107(f) is, of course, the past tense of the verb form "to occur." "Occur" has well-accepted and ordinary meaning, namely, " to present itself: come to pass: take place [or] HAPPEN." Webster's Third New International Dictionary 1561 (Philip B. Gove ed., Merriam–Webster, Inc.1993)(emphasis added).

Montana did not prove at trial that injuries to, or destruction or loss of natural resources occurred in the Upland Areas after December 11, 1980. Its argument that restoration cost damage does not "occur" until either a trustee incurs expenses to restore the resource or restoration costs are quantified by the Court, is unpersuasive.[2] If the term "occurred" was construed as argued by Montana, the "wholly before" limitation in the statute would be rendered meaningless. Both the plain language of the statute and established principles of statutory construction and common law dictate against any such interpretation. Absent proof that injuries, destruction or loss of natural resource damages occurred after December 11, 1980, the essential element of causation required by Section 107(f) is missing. See Bunker Hill Co., 635 F.Supp. at 674–75.

When the trial record is reviewed in light of the language of the act, and the

---

**2.** Montana relies heavily upon the decision of the district court in In re Acushnet River & New Bedford Harbor Proceedings, 716 F.Supp. 676 (D.Mass.1989). This Court, for the rea-

sons set out in this Memorandum, declines to adopt the interpretation given to Subsection 107(f)(1) in that opinion.

terms of the act not otherwise defined are given their accepted meanings, the conclusion to be drawn is clear. The damages sought by Montana, having "occurred wholly before December 11, 1980," are barred from recovery under CERCLA.

The Montana superfund statute (CECRA) enacted in 1985 is, by its express terms, prospective only. 1985 Mont. Laws 1613. Montana produced no evidence that actions by ARCO caused natural resource injury after 1985. CECRA has no application in this case.

Montana is not entitled to recover damages from ARCO for restoration costs at the Upland Areas under either CERCLA or CECRA. Dismissal of claims for such damages is appropriate.

### ORDER

Montana's claims against ARCO for restoration cost damages at the Upland Areas under CERCLA and CECRA are dismissed with prejudice.